# In the United States Court of Federal Claims

No. 12-907C
(Originally Filed: April 9, 2013)
(Reissued: May 1, 2013)[1]

* * * * * * * * * * * * * * * * * * * * * * *
QUEST DIAGNOSTICS, INC.,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*,

LABORATORY CORPORATION OF AMERICA,

*Intervenor*.
* * * * * * * * * * * * * * * * * * * * * * *

Bid Protest; Agency Corrective Action; Limit on Proposal Revisions after Solicitation Amendment; Incumbency

*Merle M. DeLancey*, Washington, D.C., and *Justin A. Chiarodo, Erin Wilcox Burns, Adele H. Lack, and Matthew W. Turetzky*, Washington, D.C., of counsel, for plaintiff.

*Joseph E. Ashman*, Civil Division, Department of Justice, Washington, D.C., with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kenneth G. Dintzer*, Assistant Director, for defendant. *Maj. John C. Dohn, III*, United States Army Legal Services Agency, of counsel.

*David E. Fulla*, Washington, D.C., and *Robert I. Steiner*, New York, N.Y., for intervenor.

---

[1] This opinion was originally filed under seal. Publication was deferred pending the parties' review for redaction of protected material. Redactions are indicated by brackets.

## OPINION

BRUGGINK, Judge.

Plaintiff, Quest Diagnostics, Inc. ("Quest"), protests the Army's award of a contract for laboratory testing services to the intervenor, Laboratory Corporation of America ("LabCorp"). The parties filed cross-motions for judgment on the administrative record. Plaintiff asks the court to permanently enjoin the award of the contract to intervenor. Oral argument was heard on March 5, 2013. As we announced, and for the reasons stated below, we deny plaintiff's motion and grant defendant's and intervenor's motions for summary judgment.

## BACKGROUND

The United States Department of the Army Medical Command, Center for Health Care Contracting ("MEDCOM") issued Request for Proposal No. W81k04-10-R-0005 ("RFP" or "solicitation") on August 20, 2010, seeking bids for a contract to provide clinical reference laboratory services for various treatment facilities supporting the Armed Forces both home and abroad. The contract is a follow-on to the then-expiring contract held by plaintiff. The solicitation was for a fixed price contract of an indefinite-delivery, indefinite quantity of laboratory services with a six-month transition period, a one-year base period, and four one-year option periods. MEDCOM estimated a total contract performance price of $250,000,000.

In the Basis of Award section, the solicitation laid out the four evaluation factors upon which the offerors would be evaluated: Technical Capability, Past and Present Performance, Small and Disadvantaged Business Participation, and Price. AR 98. Of the evaluation factors, "Technical Capability is significantly more important than Past and Present Performance and Small and Disadvantaged Business Participation." *Id.* Likewise, "Past and Present Performance is significantly more important than small and Disadvantaged Business Participation." *Id.* Those factors, when combined, "are significantly more important than price." *Id.* The solicitation warned, however, that "the award may not necessarily be made to the lowest price offered." *Id.* MEDCOM explained that it would make the award "based on the best overall proposal that is determined to be the most beneficial to the Government." *Id.* In other words, it would be a best value procurement.

The first factor, Technical Capability, was subdivided into five subfactors, which were separately rated by MEDCOM: Technical Approach, Laboratory Information System and Interface, Transition Plan, Quality Control Plan, and Management Capability and Experience. AR 98-99. Technical Capability and its subfactors were assigned adjectival ratings as a reflection of the agency's assessment of how well the offeror's technical proposal met the predetermined definitions of the adjectival ratings:

| **Rating** | **Definition** |
|---|---|
| Excellent | The proposal demonstrates a superior understanding of the requirements and a new or proven approach that significantly exceeds performance or capability standards. The proposal has several exceptional strengths that will significantly benefit the government. The proposal has no weaknesses or deficiencies. Normal contractor effort and normal government monitoring will be sufficient to minimize risk. The proposal is extensive, detailed, and exceeds all requirements and objectives; therefore, has a high probability of meeting the requirements with little or no risk to the government. |
| Good | The proposal demonstrates a considerable understanding of the requirements and the approach exceeds performance or capability standards. The proposal has one or more strengths that will benefit the government. The proposal has no deficiencies and any proposal weakness has little potential to cause disruption of schedule, increase in cost, or degradation of performance. Normal contractor efforts and normal government monitoring will probably be able to overcome difficulties. The proposal generally exceeds requirements in minor areas; therefore, has a strong probability of meeting the requirements with little risk to the government. |

| | |
|---|---|
| Satisfactory | The proposal demonstrates an adequate understanding of the requirements and the approach meets all performance or capability standards. The proposal has no strengths that exceed the requirement. The proposal has no material weaknesses and no deficiencies. The proposal has some weaknesses that can potentially cause disruption of schedule, increase in cost, or degradation of performance. Special contractor emphasis and close government monitoring will minimize any risk. The proposal meets the minimum requirements; therefore, has a Satisfactory probability of successfully meeting the requirements. |
| Marginal | . . . |
| Unsatisfactory | . . . |

AR 99-100.

MEDCOM similarly evaluated the second factor, Past and Present Performance, on the basis of risk of performance problems and assigned a corresponding adjectival rating: Exceptional (Risk Level: Very Low); Very Good (Risk Level: Low); Satisfactory (Risk Level: Moderate): Marginal (Risk Level: High); Unsatisfactory (Risk Level: Very High); Unknown (Risk Level: Unknown). AR 101. Small and Disadvantaged Business Participation, the third factor, was rated either "satisfactory" or "unsatisfactory."

MEDCOM received three proposals, from which it established a competitive range consisting only of Quest and LabCorp. AR 2468. MEDCOM then held three rounds of discussions with both offerors in which it received clarifications and additional information from each. The agency then evaluated Quest's and LabCorp's proposals for the Technical Capacity factor and its subfactors. MEDCOM rated the proposals as follows:

| | Technical Approach | LIS and Interface | Transition Plan | Quality Control Plan | Management Capability and Experience | Overall |
|---|---|---|---|---|---|---|
| Quest | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| LabCorp | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |

AR 2381-82. "LIS" refers to Laboratory Interface System.

For Past and Present Performance, Quest was rated as [ ] and LabCorp as [ ]. AR 2384. MEDCOM scored both offerors [ ] for Small Business and Disadvantaged Business Participation. *Id.* Quest had the lowest evaluated price, which was determined to be "fair and reasonable" by the Contracting Officer ("CO"). Based on these assessments, he awarded the contract to Quest on April 14, 2011. AR 2385.

On May 5, 2011, LabCorp protested the award to Quest at the Government Accountability Office ("GAO"). When GAO advised the agency that it would likely sustain the protest, AR 3779, MEDCOM informed GAO that it would take corrective action by amending the solicitation "to include estimated quantities of usage . . . to approximate the amount the Agency expects to spend." AR 2739. MEDCOM would also then request "resubmission of price proposals from Quest and LabCorp, and reevaluate the price factor." *Id.* GAO dismissed the protest as academic.

MEDCOM revised the price estimate and issued several amendments in conformity with its intent to take corrective action. It added estimated usage for certain contract items and informed the offerors of its new methodology for evaluating price. AR 4067. Amendment 12 further instructed offerors that "[i]f any changes identified by this amendment cause a revision to other than the pricing of your proposal, please submit same in number of copies and format as your original submission." AR 3971. This was followed by another round of discussions between MEDCOM and the offerors.

In February and March 2012, LabCorp and Quest updated their technical proposals and submitted final revised proposals with their new price volumes. Shortly thereafter, MEDCOM issued an amended source selection decision and awarded the contract to LabCorp on April 2, 2012. AR 3786.

In reaching that result, MEDCOM re-evaluated both proposals in their entirety. Non-price factors remained the same, except that LabCorp's rating for subfactor 1B, LIS was upgraded to [ ] from [ ] based on the updates to LabCorp's proposal regarding its progress in implementing and testing its LIS.[2] The revised evaluated prices for the base year plus four options were [ ] for Quest and [ ] for LabCorp.

[2] Both offeror's ratings for Factor 1, Technical Capacity, remained [ ].

AR 3784. This represented a [ ] difference in price. The Source Selection Authority ("SSA"), in this case the CO, found that, although Quest was rated higher than LabCorp in Past and Present Performance, that difference was not worth the price differential, given that LabCorp's Past and Present Performance score of [ ] still represented a low risk to the agency. AR 3785.

Quest filed a protest at GAO on June 12, 2012, arguing that MEDCOM failed to properly evaluate the technical proposals, deviated from the stated evaluation criteria for price proposals, conducted a flawed best value tradeoff, engaged in unequal discussions, and failed to amend the solicitation to reflect new requirements. AR 4102-112. MEDCOM responded by once again offering to take corrective action by reevaluating proposals in accordance with the terms of the RFP. *See* AR 4152. The Source Selection Evaluation Board ("SSEB") was tasked to "review [its] previous evaluation and to conduct a closer look at their application of the Technical Adjectival Ratings and particularly the definitions set out in the solicitation, against each offeror's proposal to ensure that the adjectival ratings were correctly applied." AR 4188. The result was that the SSEB upgraded both offeror's ratings in multiple subfactors under Factor One, Technical Capacity:

| Offeror | Technical Approach | LIS & Interface | Transition Plan | Quality Control Plan | Management Capability & Experience |
|---|---|---|---|---|---|
| Quest | [ ] | [ ] | [ ] | [ ] | [ ] |
| LabCorp | [ ] | [ ] | [ ] | [ ] | [ ] |

AR 4156 (Quest); AR 4163 (LabCorp).[3]

The SSEB reconvened shortly thereafter and changed one of its subfactor ratings for Quest. It downgraded Quest's Transition Plan rating from [ ] to [ ]. AR 4177. The SSEB noted that this was "no change to the overall evaluation of this subfactor from the 14 March 2012

[3] Although not explicitly stated in the AR, it is clear that the upward change in the various technical ratings was due to the agency's literal application of the description of a "good" rating from the solicitation. If an offeror had at least one strength identified and no weaknesses, it was rated as "good" rather than the earlier rating of "satisfactory." *See* AR 100 (definition of "good").

assessment." *Id.* What it removed was one previously identified [ ], that Quest's proposal [ ]. AR 4159. *Compare* AR 4159 *with* AR 4177.

The final result of the second corrective action was that Quest's and LabCorp's overall ratings for Factor 1, Technical Capability, were upgraded to [ ]. For Factor 2, Past and Present Performance, Quest kept its [ ] rating and LabCorp its [ ] rating. For Factor 3, Small and Disadvantaged Business Participation, both offerors kept their [ ] ratings. AR 4190. The SSA again awarded the contract to LabCorp, finding that "Quest did not demonstrate strengths in [its] proposal that are so significantly superior to LabCorp's proposal that clearly justifies paying an award price that is potentially [ ] higher over the life of the contract than LabCorp." AR 4191. Recognizing the superior rating for past performance, the CO found that a [ ] premium was not worth the improvement from [ ] to [ ] when the [ ] rating of LabCorp still represented a low risk to the government. AR 4191-92. This was especially the case, for the CO, "in light of budgetary cuts/limitations imposed through Congressional mandates." AR 4192.

Quest was notified of the award to LabCorp on September 12, 2012, and it requested a debriefing, which it received on September 17, 2012. *See* AR 4272-80. Quest then filed a protest at GAO, challenging MEDCOM's technical evaluation, alleging that the agency did not properly consider unit pricing, arguing that its best value decision was flawed, asserting that the agency engaged in unequal discussions, and arguing that it should have amended the solicitation to reflect changes in what it sought under the contract. *See, e.g.*, AR 4293-94. GAO denied the protest on the merits, holding, *inter alia*, that there was no basis to question the technical evaluation, and, where there was, Quest had not shown prejudice. AR 4860-64. As to Quests other protest grounds, GAO dismissed them each in turn, holding that there had been no unequal discussions, that the agency had properly priced the proposals, and that the best value tradeoff was proper. AR 4865-67. Quest then filed the present action on December 26, 2012.

## DISCUSSION

We have jurisdiction to render judgment on an action by an "interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any

alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). Quest is an "interested party" because it was an "actual . . . bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

We review agency action in the bid protest context under the deferential standards of administrative review borrowed from the Administrative Procedures Act. *See* 28 U.S.C. § 1491(b)(4) (2006). MEDCOM"s actions can only be enjoined if we find them to have been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (2006). In the course of our review, we must not substitute our judgment for that of the agency's. *See Redland Genstar, Inc. V. United States*, 39 Fed. Cl. 231 (1997). All that is required of an agency is that it has a reasonable basis for its decision. *See Honeywell, Inc. V. United States*, 570 F.2d 644, 684 (Fed. Cir. 1989).

Plaintiff challenges MEDCOM's evaluation of three subfactors under the Technical Capacity factor. It also alleges that LabCorp was allowed improperly to amend its proposal after the first corrective action by submitting new technical information. Plaintiff further alleges that LabCorp did not offer specific laboratory tests required by the solicitation and thus should have been either ineligible for award or evaluated to be more expensive. Finally, plaintiff asserts that MEDCOM's best value tradeoff was insufficient both in substance and in documentation. We begin with the allegation that LabCorp was improperly allowed to amend its technical proposal as it bears on certain of plaintiff's other arguments as well.

I. MEDCOM Did Not Allow LabCorp to Amend its Proposal Improperly

Quest alleges that LabCorp's proposal revisions in response to the agency's first corrective action were nonconforming because they included technical revisions outside the scope of the corrective action, which was directed at the agency's pricing evaluation methodology. LabCorp took the opportunity to update other aspects of its technical proposal. Quest argues that these revisions were outside the scope of the corrective action and thus should not have been considered by the agency. Quest also argues that MEDCOM engaged in unequal discussions with the two offerors by telling LabCorp that it could update its technical proposal while not telling Quest the same thing. As a result, plaintiff asserts that LabCorp was either ineligible for award

because its proposal was nonconforming or, at a minimum, that the agency should not have considered LabCorp's changes to its technical proposal.

Quest's underlying factual premise is correct; the disputed revisions to intervenor's technical proposal dealt mainly with updates to LabCorp's implementation and testing of its LIS system, while Amendment 12 was triggered by questions as to pricing. LabCorp's updated information in turn allowed MEDCOM to raise LabCorp's rating for subfactor 1B from [ ] to [ ], which may have influenced the agency's decision to award to LabCorp.

GAO's recommendation in this case states correctly, we believe, the controlling legal principle: "[u]nless an agency restricts the scope of the revisions offerors may make to their proposals in responding to solicitation amendments issued by the agency as part of corrective action, offerors may revise any aspect of their proposals, including those that were not the subject of the amendment(s)." AR 4865 (citing *Power Connector, Inc.*, B-404916.2, 2011 CPD ¶ 186 at 3-4 (Comp. Gen. Aug. 15, 2011)). This court accepted that rule in *ManTech Telecommunications. & Information Systems Corp. v. United States*, 49 Fed. Cl. 57, 75 n.29 (2001) (recognizing the general rule that offerors may "revise any aspect of their proposals they see fit, including portions that were not the subject of the amendment and discussions"), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002). The rationale is that, in negotiated procurements, an offeror should be able to update its proposal through the various rounds of negotiations and revisions which typically take long periods of time. Therefore, when an agency asks, as here, for new or newly formatted information with respect to a discrete part of a proposal, there is no reason to assume a limitation on revisions to other parts of the proposal unless one is explicitly stated.

The decision in *Mantech Telecommunications* explains that, were this not the rule,

> and the government was instead required to preserve inviolate all rating advantages enjoyed by a protestor in the initial selection process, it would be the rare situation, indeed, where the government could exercise the authority conferred by the FAR to amend a solicitation or conduct further discussions, because in most processes a protestor could point to some ratings advantage on either a factor or a subfactor that might be

lost if new or revised proposals were filed.[4]

49 Fed. Cl. at 57.

That reasoning comports with the FAR's instruction to offerors that they "may submit modifications to their proposals at any time before the solicitation closing date and time, and may submit modifications in response to an amendment, or to correct a mistake at any time before awards." 48 C.F.R. § 52.215-1(c)(6) (2012); *see also* 48 C.F.R. § 52.212-1(f)(1) ("Offerors are responsible for submitting offers, and any modifications, revisions, or withdrawals, so as to reach the Government office designated in the solicitation by the time specified in the solicitation."). It is no great leap of logic to extend this rule to the context of agency corrective action prompted by a recommendation of GAO.[5] When agency corrective action invites proposal revisions by offerors, the solicitation is reopened, and those offerors can submit modifications until the new closing date. Those modifications are not limited to the areas addressed by the corrective action unless explicitly stated. The only question remaining here, then, is whether the agency explicitly limited the proposal revisions to those things treated by Amendment 12.

Amendment 12 changed the agency's pricing approach and instructed offerors to submit pricing information which included all of the testing items listed in Attachment 7 so that the agency could properly use those prices against its estimated usage rates to compute a new price. It was a part of the

---

[4] In *Mantech Telecommunications*, Mantech protested the Army's proposed corrective action after Mantech had filed a protest at GAO. Mantech challenged, among other things, the agency's ability to amend the technical portion of the solicitation after plaintiff had only challenged the evaluation of price proposals. In essence, it sought to protect its existing advantage in technical ratings. Mantech argued that it was unfair to allow the other offeror to improve its technical proposal after Mantech had been prejudiced by errors in the evaluation of price. 49 Fed. Cl. at 74-75.

[5] In fact, GAO has extended the rule to mean that an agency cannot limit the scope of proposal revisions after corrective action unless it can show that "the amendment could not reasonably have any effect on other aspects of proposals, or that allowing such revisions would have a detrimental impact on the competitive process." *Cooperative Muratori Riuniti*, B-294980.5, 2005 CPD ¶ 144 at 5 (Comp. Gen. July 27, 2005).

corrective action resulting from the first GAO protest. The amendment established a new date for final proposal revisions, AR 4017-18, and instructed offerors that, "[i]f any changes identified by this amendment cause a revision to other than the pricing of your proposal, please submit same in the number of copies and formats as your original submission." AR 3971.

Plaintiff reads a limitation on proposal revisions to allow only those related to pricing. Although it is true that the language quoted above plainly refers to the possibility that pricing changes might trigger changes to the technical substance of a proposal, to agree with plaintiff we would have to go further and rule that the same language, despite the default rule discussed above, precluded changes to a proposal not triggered by Amendment 12. There is plainly no explicit limitation in the amendment, and we decline to insert one. At best, plaintiff should have perceived an ambiguity in the amendment, which would then trigger an obligation to enquire of the agency whether a limitation was intended.[6] LabCorp's technical revisions were therefore proper, and its bid could be accepted by the agency.

Plaintiff's allegation that the agency engaged in unequal discussions are based on MEDCOM's answers to discussion questions after it decided to take corrective action. Quest believes it was misled by the agency when it asked, "[i]n the event that a change is made to our Technical Volume, is a full resubmission of the bid . . . required or should we only resubmit the volumes of their [sic] proposal that required updates." AR 4557. The CO discussed this inquiry with Quest over the telephone and answered by reiterating the language of Amendment 12, that offerors were to submit new volumes in the same format and number of copies as the original if changes to them were made. AR 4557. The CO thus obviously interpreted the inquiry as one going to procedure and not substance.

LabCorp, on the other hand, asked the agency whether offerors would "be able to resubmit portion[s] of the solicitation for further committee review and evaluation, particularly if the vendor's capabilities have changed or been enhanced since its original response to the RFP? . . . If we do submit such information, please confirm [that] any sections submitted will be re-evaluated by the lab committee." AR 3817.2. The CO answered this question by

---

[6] *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313-15 (Fed. Cir. 2007) (holding that patent ambiguities or errors must be raised before bidding on a solicitation).

telephone and explained that MEDCOM "could not restrict [LabCorp] from submitting information other than pricing, and yes it would be looked at by the evacuation team." AR 3822 (Memo for Record, Jan. 11, 2012).

In short, Quest and LabCorp received different answers because they asked different questions. LabCorp asked whether it could submit updates to its proposal to account for changes in its capabilities and the passage of time. Quest asked only whether it should submit a new proposal in whole or only the technical volume, if changes were made changes to it. The agency was under no duty to answer a question not asked of it, nor was it under a duty to restate the general rule that proposal revisions of any kind could be made up until the deadline for final offers. MEDCOM thus did not engage in unequal discussions or mislead Quest.

II. MEDCOM Properly Evaluated Offeror's Technical Proposals

A. Quest's Transition Plan

Plaintiff challenges its final rating of [ ] for Subfactor 1C, Transition Plan, on the basis that it previously had been rated as [ ] and that the downgrade to [ ] was without support in the record. The agency's second corrective action, during which it reconsidered proposals to insure that "adjective ratings were correctly applied," AR 4188, resulted in rating of [ ] for Quest's Transition Plan subfactor. The SSEB, meeting in July 2012, identified as a [ ] that Quest's proposal [

]. AR 4159. No [ ] were identified. Based on the application of the solicitation's description of a "good" rating as having a strength, Quest was then evaluated as [ ] for subfactor 1C. The SSEB reconvened in August 2012, and upon direction from the CO, eliminated the identified [ ], retracted the [ ] rating, and assigned [ ] as Quest's rating for its Transition Plan. Plaintiff challenges this change as unsupported and arbitrary. Defendant and intervenor answer that the SSEB and CO were correct in downgrading Quest based on the proper application of the adjectival rating scheme because Quest's transition plan merely met requirements and did not exceed them so as to merit a rating of [ ].

We cannot say that the SSEB and CO were irrational or arbitrary in their final evaluation of Quest as [ ] for Subfactor 1C. Although the SSEB initially assessed Quest's plan as being strong because it had

demonstrated its then-capability to meet requirements, it was rational for the SSEB, in concert with the SSA, to downgrade that rating to [ ] when it considered that meeting solicitation requirements should not be considered a strength and thus not merit a better rating. The SSA's (CO's) memorandum reflects that, upon his review of the SSEB's July 2012 evaluation, he "determined that the [[ ] rating] was apparently in error and did not fall into the definition of [ ] as there were [ ]. AR 4189. The SSEB's August 2012 final evaluation reflects the SSA's determination and notes that the August 2012 [ ] rating was consistent with its earlier March 2012 evaluation. AR 4267.

The definition given by the solicitation for a rating of "good" states, in part, that the proposal "has one or more strengths that will benefit the government" and that it does not have any "deficiencies." AR 100 Any weakness found in the proposal "has little potential to cause disruption of schedule, increase of cost, or degradation of performance." *Id.* "The proposal generally exceeds requirements in minor areas . . . ." *Id.* A subfactor rated "good" "demonstrates considerable understanding of the requirements and the approach exceeds performance or capability standards." *Id.* A "satisfactory" proposal is one which "demonstrates adequate understanding of the requirements and the approach meets all performance or capability standards. . . . the proposal has no strengths that exceed the requirement" and "no material weaknesses and no deficiencies. . . . [It] has some weakness that can potentially cause disruption of schedules, increase in cost, or degradation of performance." *Id.* In sum, it "meets the minimum requirements." *Id.*

The [ ] identified by the SSEB in July 2012 was that Quest's transition plan showed a [ ] and that this would [ ] if Quest received the award. AR 4159. Meeting the contract requirements, however, is embraced by the solicitation's definition of a "satisfactory" rating. A "good" rating requires that a "proposal generally exceeds requirements in minor areas." AR 100. The SSEB did not identify an area in which Quest's proposal exceeded the requirements. We recognize that the July 2012 rating also reflected a view that Quest's transition plan[ ], which would fit under the definition of a "good" rating. We understand, however, that the likelihood of no delay is also consistent with a

"satisfactory" rating.[7] "Satisfactory" allowed for the possibility of minor delay. An estimation that no delay would take place is not a reason, in and of itself, under these adjectival definitions, to elevate a subfactor from [ ] to [ ]." A proposal would also have to exceed requirements in some minor way in order to be rated [ ]. The SSA's determination that Quest's proposal did not exceed requirements for this subfactor was thus neither arbitrary, capricious, nor unsupported by the record.

B. LabCorp's LIS and Interface

1. Testing and Completion

Plaintiff takes exception to MEDCOM's [ ] rating of LabCorp for Subfactor 1B, Laboratory Information System and Interface. It argues that LabCorp was not eligible for a [ ] rating because it did not complete its LIS interface prior to award. Quest points to MEDCOM's 2011 rating of LabCorp's LIS system, which was a [ ] and identified a [ ] because the agency determined that [

]. AR 2418. Quest alleges, without citation, that LabCorp did not thereafter successfully implement its interface at any government facility. Quest argues that the agency was mistaken in its subsequent 2012 rating of [ ] because it incorrectly believed that LabCorp's interface was developed and tested.

Defendant and intervenor argue that the language cited by plaintiff is not a current capability requirement but is rather prospective, requiring the offeror to be able to interface with the LIS system at the time of performance.

---

[7] We also recognize what might be seen as an ambiguity in the rating scheme because the definition of [ ] includes language that the proposal "has some weakness." Plaintiff points out that it did not have any assigned weaknesses and argues that this meant that it was deserving of a [ ] rating. By that same logic, however, plaintiff would have been owed an "excellent" rating because the definition of "excellent" was the only adjectival rating that was defined as having no weaknesses of any kind. Read together, we understand the ratings definitions with regard to weaknesses as a level of tolerance in each rating level for weaknesses. Both "satisfactory" and "good" could have minor weaknesses. "Good" could not have any deficiencies. "Excellent" could have neither.

They cite the SSEB's statement that, although a [ ] was recognized during the first evaluation, [ ]. AR 2190. They conclude that plaintiff's challenge to the [ ] rating is nothing more than a disagreement with the agency's ratings.

Much of plaintiff's argument is based on the premise that it was improper for MEDCOM to have considered the updated information provided by LabCorp in its 2012 proposal revisions. As explained above, we reject that notion. What remains then is to consider whether it was irrational for MEDCOM to upgrade LabCorp's revised proposal to a rating of [ ] for Subfactor 1B.

For the LIS subfactor, the solicitation explained that the agency would consider "[t]he offeror's understanding of the deployment of the LIS and the resources needed to ensure interface with the government's system." AR 3928. In doing so, "[a]ll submitted information that demonstrate[s] the offeror's understanding [of] the interface requirements and how they intend to ensure that this requirement is met in a timely and efficient manner will be evaluated." *Id.* The Performance Work Statement detailed the various tasks and services required of the offeror. For LIS, the work statement provided: "[LIS] to include on-line direct interface with the CHCS or current Government LIS at each SA in order to electronically transmit test results into CHCS."[8] AR 3883.

LabCorp represented in its February 2012 technical proposal that "direct interface with CHCS for electronic ordering and transmitting of results will be available to each SA. Direct interface with CHCS is in progress and estimated availability for deployment in late Q1 2012." AR 2793. Labcorp explained that it had subcontracted with another company that is an expert in "DOD Interoperability" and that "[d]evelopment and regression testing" were completed. *Id.* It also informed MEDCOM that further interface testing was ongoing using its subcontractor's existing "CHCS Lab Development System to verify appropriate LabCorp changes, ensuring that the interface will be 100% compatible with CHCS orders being sent out and retuning inbound results." AR 2795. LabCorp promised that its full LIS and interface would be deployable in the late first quarter or early second quarter 2012. AR 2793,

---

[8] "CHCS" represents "Composite Health Care System" and "SA" is the "Submitting Authority."

2795.

That information in hand, the SSEB revised LabCorp's prior [ ] rating upward to [ ] based on the representation that LabCorp's [ ]. AR 3814. LabCorp was also assessed as having [ ] that would benefit MEDCOM, one of which we will discuss in the next section.

We read the solicitation in the same way as defendant and intervenor. MEDCOM wanted to buy the laboratory testing services from an offeror who could offer the agency an LIS system that would interface with the existing system at each location contracted for. Plaintiff, on the other hand, treats the Performance Work Statement as a certification requirement of a then-existing capability to interface with the government CHCS or LIS interfaces at each place where the agency might order testing services. Read that way, only the incumbent could have met that requirement as it was the only offeror then-able to interface with the various Submitting Authorities. That is plainly not what the solicitation required.

LabCorp informed MEDCOM of its progress in testing and developing its interface, including its subcontract with a company with experience with these systems. It promised full deployment of an interface-ready LIS in late second quarter 2012, which is when the SSEB and SSA were evaluating proposals. Thus it was reasonable for the SSEB to conclude that LabCorp could offer a fully compliant and operable LIS at the time of performance. That fact allowed the raters to eliminate the prior-cited weakness and, based on the several other strengths, upgrade LabCorp's rating for this subfactor to [ ].

2. LabCorp's [ ] Assigned for a Feature Removed from its Proposal

Plaintiff also highlights the fact that one of the features evaluated in intervenor's original 2010 proposal under the LIS subfactor was removed from its revised proposals but continued to be cited by MEDCOM as deserving of a [ ]. This was based on a Laboratory Communications Manager ("LCM") position, which LabCorp initially offered and the agency found to merit a strength because it would "back-up bidirectional interface to ensure continuity of operations." AR 4183. That position was lined out of intervenor's subsequent proposals, and should not have continued to receive a [ ] from the agency. Plaintiff does not allege how the absence of this

[ ] would have impacted intervenor's score for Subfactor 1B, but it cites this as an example of disparate treatment.

We agree with defendant and intervenor that, though the continued citation of the LCM as a [ ] in LabCorp's proposal was in error, plaintiff cannot show that it was prejudiced. LabCorp still was assigned [ ] other evaluated [ ], none of which is challenged by plaintiff, and it received no [ ]. This put LabCorp well within the description of a [ ] rating. Plaintiff has not alleged how this indicates any disparate treatment in its own ratings, and thus we disregard the error as harmless. MEDCOM's rating of LabCorp as a [ ] for its LIS subfactor was not arbitrary or capricious.

C. Quest's Management Capability and Experience

For technical Subfactor 1E, Management Capability and Experience, LabCorp was rated [ ] and Quest was rated [ ]. Plaintiff believes these ratings were in error because LabCorp was assigned a [ ] for its DOD Contract Director while Quest was not given a [ ] for an equivalent position and because MEDCOM double counted the experience cited by LabCorp under this subfactor. Plaintiff also argues more generally that its experience as the incumbent was ignored for this subfactor, which artificially deflated its rating.

1. Quest and LabCorp Did Not Propose The Same DOD Contract Director

[paragraph omitted]

[paragraph omitted]

[

]. Although these differences are not dramatic, we agree with defendant and intervenor that they form a basis upon which a distinction could be drawn. Though the overall goals of the two management teams may have been similar, given that additional detail, it was not irrational or arbitrary for the agency to assign greater value to LabCorp's proposal in this regard.

2. LabCorp's Alleged Inflated Corporate Experience Did Not Prejudice Quest

The agency cited as a [ ] for Subfactor 1E that LabCorp possessed management experience for two large contracts, it's Federal Supply Schedule ("FFS") contract and its contract through the FFS with the Department of Veterans Affairs ("VA"). Quest asserts that these are not properly considered as relevant management experience because neither was truly a large contract and neither was listed by LabCorp in its past performance volume.

While intervenor largely ignores the issue, defendant argues that, even if it is assumed that the agency was wrong in assigning a [ ] for the FFS and VA contracts, plaintiff cannot show that it was prejudiced because LabCorp still had [ ] and [ ], making it rational for the agency to award LabCorp an [ ] rating for Management Experience and Capability. We agree.

Plaintiff has not alleged that LabCorp would have been downgraded absent the [ ] for large contract management experience. Instead, it argues vaguely that "any Strength could make a difference" in a best value procurement. Pl.'s Resp. Br. 24. That is insufficient. Even without this challenged [ ], LabCorp's proposal for Subfactor 1E had [ ] and no [ ]. Plaintiff has not shown how the rating would have changed, and this is presumably why it has not tried to, arguing more broadly that it was prejudiced because the CO might have based his best value tradeoff decision on this analysis of the subfactor rating. This now-missing [ ] is not cited in that tradeoff decision, making plaintiff's prejudice argument attenuated and completely speculative.

3. Quest's Experience as the Incumbent Did Not Entitle it to a Higher Rating Under This Subfactor

Although Quest abandoned the argument in its response brief that its incumbency was ignored by the agency in evaluating this subfactor, we mention it briefly because it appears that plaintiff reasserted the argument in its reply brief in a somewhat different form. In its reply brief, plaintiff argues that the CO refused to allow the SSEB to consider the advantages offered by Quest's incumbency despite the fact that the CO relied on his personal knowledge about work LabCorp had performed through its FFS contract.

Piggybacking this argument on plaintiff's prior challenge to LabCorp's large contract management experience merely masks the fact that Quest wishes to be credited independently for its experience as the incumbent contractor. As defendant points out, however, Subfactor 1E was not merely a test or a comparison of each offeror's previous contract management experiences. The solicitation asked offerors to "[d]escribe [their] company's overall managment ability and [their] understanding of the management techniques required to perform services under this solicitation." AR 3921. Bidders were asked to furnish detail as to key positions they would offer and the qualifications required of those positions. *Id.* If the offeror intended to partner with another contractor, they were asked to explain what the roles and responsibilities of that partner would be. *Id.* The solicitation explained that offerors would be evaluated to "determine [their] understanding of the organization and logistics of the management services, qualifications of key personnel and experience required to perform under this solicitation." AR 3928. It also stated that "[m]anagement techniques employed to ensure quality services throughout the life of the contract will also be evaluated." *Id.*

Quest has not explained how, given the aim of this subfactor, mere incumbency entitled it to any additional strengths. Quest was rated as [ ] and the agency found a strength in its demonstrated ability to meet contract requirements. AR 4179. It then listed the other items that were responsive to the solicitation from Quest's proposal. By contrast, [ ] of LabCorp's [ ] were because of its more thorough description of management structures and key personnel and their qualifications. *See* AR 4186. It was not irrational for the agency to have assessed additional value to LabCorp's proposal under these circumstances.

III. LabCorp's Proposed Clinical Tests Met Agency Requirements

Plaintiff alleges that LabCorp did not meet the requirements of the solicitation because certain of it proposed testing methodologies were not based on the required methodologies for those tests. Therefore, according to plaintiff, its solicitation should have been considered nonconforming or, at a minimum, rated lower than it was. Plaintiff avers that LC/MS tests are generally more expensive, and, by [ ] of them, LabCorp was able to lower its price. Quest then compares its prices for the LC/MS tests with LabCorp's prices for LC/MS tests and alleges them to be 134 percent higher. *See id.* at 34. Defendant and intervenor answer that offerors were afforded discretion in providing equivalent testing methodologies to those listed in the solicitation.

Attachment 7 to the solicitation listed tests for which offerors were instructed to "populate each list . . . with their equivalent test Unique Service Code." AR 3927. Certain of these tests were based on liquid chromotagraphy–mass spectrometry ("LC/MS"). Plaintiff alleges that with respect to [ ]. Quest lists these tests and informs the court, without citation, that these methodologies are not equivalents because they do not use LC/MS methodology. *See* Pl.'s Mot. for J. on the AR 33.

The agency knew what tests had to be performed. It listed them in Attachment 7 and instructed offerors to list their own corresponding tests. MEDCOM realized the discrepancy in price between various methodologies and instructed offerors that it "was incumbent upon [them] to determine the test methodology which they consider will provide the best price for each test." AR 3924. Offerors thus were vested with the discretion to offer

methodologies they considered equivalent. MEDCOM did not identify any methodologies offered by LabCorp as nonconforming, and we are not in a position to second guess that evaluation. Quest's bald assertion that LabCorp's offered testing methodologies were insufficient provides no basis for us to evaluate what LabCorp offered. Given the discretion afforded each offeror to offer equivalent methodologies, the issue of whether a particular test met the agency's requirements becomes a matter of contract performance, not the basis for a bid protest.

IV. MEDCOM's Best Value Analysis Was Neither Irrational Nor Undocumented

Quest's final argument essentially is that the agency transformed the procurement from a best value procurement to a lowest priced, technically acceptable one. The offerors were rated similarly for each factor and subfactor, although Quest had a slight advantage in non-price factors, and LabCorp was the lowest priced offeror. From this, Quest concludes that the CO did not perform a true best value tradeoff. Quest also alleges that any best value tradeoff he might have performed was not adequately documented.

Defendant and intervenor argue that the SSA's decision was sufficiently documented and that it reflects consideration of the relevant factors. They also remind the court that agencies are vested with "substantial discretion to determine which proposal represents the best value to the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Intervenor cites multiple precedents in which awards to lower priced, lower rated offerors have been upheld by this court and GAO. *See Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl. 488, 514 (2009); *LEADS Corp.*, B-311002, 2008 WL 1990954, at *2 (Comp. Gen. Mar. 26, 2008).

Although the best value determination here was brief, it was not devoid of substance. The CO recognized plaintiff's edge in Past and Present Performance, but concluded that this edge was not that significant, given that LabCorp's [ ] rating still assured a relatively low risk to the agency. *See* AR 4191. He further stated that the offerors' technical proposals, although differing slightly between subfactors, were basically equivalent, in view of the fact that both had been rated as [ ] for Technical Capability. The offerors had an identical number of [ ], [ ], and [ ] ratings for the technical subfactors. That being the case, the CO concluded that Quest's proposal was not "so significantly superior to LabCorp's proposal that

[it] clearly justifies paying an award price that is potentially [ ] higher over the life of the contract." AR 4191.

Quest argues that the CO should have performed a further weighing of each subfactor and the proposals' associated strengths to determine which offeror's [ ] was more important than the other offeror's [ ]. We decline to impose such a requirement. The CO explained that he did not find the technical differences to warrant assigning either offer an advantage and not illogically concluded that Quest's higher price diminished its slight advantage in Past and Present Performance. In the CO's judgment, the balance weighed in favor of price as the discriminating factor in this case. That balancing of price against advantage was documented sufficiently by the CO. His exercise of judgment was not shown to be arbitrary, capricious, or in violation of law.

## CONCLUSION

Because plaintiff has not shown the agency's conduct to be arbitrary, capricious, or unlawful, defendant and intervenor are entitled to judgment on the administrative record. We deny plaintiff's motion for judgment on the administrative record and grant defendant's and intervenor's motions. Accordingly, the clerk of court is directed to enter judgment for defendant and dismiss the complaint. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge